**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
UNITED STATES OF AMERICA

                            Plaintiff,

            - against -

GORDON SMITH, SR.,

                          Defendant.

------------------------------------------------------------X

        **REPORT AND**
        **RECOMMENDATION**

        CV  18-3920 (RRM) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    **PRELIMINARY STATEMENT**

       Plaintiff, the United States of America ("Plaintiff" or the "Government"), on behalf of the

United States Environmental Protection Agency (the "EPA"), commenced this action against

Gordon Smith, Sr. ("Defendant" or "Smith"), a member of the Shinnecock Indian Nation (the

"Shinnecock Nation"), pursuant to Section 309(b) and (d) of the Clean Water Act ("CWA"), 33

U.S.C. § 1319(b) and (d).  *See generally* Plaintiff's Complaint ("Compl.") [DE 1].  Smith resides

at 5 East Creek Way, Southampton, New York (the "Property"), within the geographic

boundaries of the Shinnecock Nation's territory.  Compl. ¶ 7. He is representing himself *pro se*

in this matter.  The Government alleges, among other things, that Smith:  (1) violated CWA

Section 301(a), 33 U.S.C. § 1311(a) by unlawfully discharging "pollutants in the form of fill

material, without a permit, into waters of the United States, consisting of salt-marsh wetlands

within the geographic boundaries of the Shinnecock Indian Nation Territory in the Town of

Southampton, New York;" (2) failed to respond "to an information request issued by [the] EPA

pursuant to CWA Section 308(a), 33 U.S.C. § 1318(a);" and (3) failed to comply "with an

administrative order issued by [the] EPA pursuant to CWA Section 309(a)(3), 33 U.S.C. § 1319(a)(3)." Compl. ¶ 1.

On July 9, 2018, the Government filed a proposed Order To Show Cause seeking, among other remedies, a preliminary injunction. *See* DE 4. Judge Spatt, who was then assigned to this case, signed the Show Cause Order on July 9, 2018 and directed Defendant Smith to appear before the undersigned on July 18, 2018 and show cause "why an Order should not be issued, pursuant to Rule 65 of the Federal Rules of Civil Procedure, granting plaintiff (1) a preliminary injunction to restrain Defendant and those individuals acting in concert with him, from placing fill material into waters of the United States from his allotment of land, located at 5 East Creek Way on the eastern shore of the Shinnecock Indian Nation territory within the geographic boundaries of the Town of Southampton, New York; and (2) an order, pursuant to Fed. R. Civ. P. 26(d)(1) permitting limited expedited discovery requiring defendant to disclose information, updated to the present, that [the] EPA requested through an RFI dated May 1, 2017." DE 6 ("So Ordered" Show Cause Order). Defendant Smith filed a *pro se* form Answer on July 17, 2018, generally denying the Government's claims of violations of the CWA and asserting that the Court does not have jurisdiction over him or this action because the Shinnecock Nation has sovereign immunity and is a "self governing" Nation. *See generally* the Answer ("Answer") [DE 22].

The preliminary injunction hearing began on July 18, 2018 and was continued to August 14, 2018. *See* July 18, 2018 and August 14, 2018 Minute Orders [DE 8, 15]. On July 19, 2018, the Government filed its formal Motion for Preliminary Injunction. *See* Government's Motion for Preliminary Injunction ("Govt.'s Mot.") [DE 10]. Judge Spatt recused himself from this case on August 14, 2018 and the case was reassigned to Judge Bianco that

same day.  *See* Order of Recusal [DE 14].  On August 22, 2018, Judge Bianco referred the formal Motion for Preliminary Injunction to this Court for a Report and Recommendation.  *See* DE 18.  On May 30, 2019, this matter was reassigned to Judge Mauskopf who presently presides over this action.  For the reasons which follow, this Court respectfully recommends to Judge Mauskopf that the Government's motion for a preliminary injunction and other relief be GRANTED.

## II.    FACTUAL BACKGROUND

The facts presented here are taken from the Complaint.  Defendant Gordon Smith is a private individual who lives on 5 east Creek Way, Southampton, New York.  Compl. ¶ 7.  The Property was allotted to him for residential purposes only by the Shinnecock Nation.  *Id.* ¶ 21.  At the request of the Shinnecock Nation Council of Trustees, the EPA conducted an inspection of the Property on June 30, 2016.  *Id.* ¶ 23.  At the inspection, the EPA recorded data from soil samples taken from two different locations on the periphery of the fill area. Id. ¶ 24. Both locations exhibited characteristics of wetlands as well as the presence of hydrophytic vegetation and hydric soils.  *Id.*  The data recorded at the inspection confirmed that the area onto which fill material was placed is wetlands within the meaning of the Clean Water Act.  *Id.* ¶ 25.  These wetlands are adjacent to Heady Creek which is subject to the ebb and flow of the tide.  *Id.* Heady Creek is an arm of Shinnecock Bay which is a tidal embayment of the Atlantic Ocean.  *Id.* ¶ 26.

The Complaint asserts that beginning in 2013, the Defendant and/or persons acting at his direction and/or with his knowledge and/or consent caused and continue to cause earth-moving activities on the Property that have resulted in the discharge of fill material into one-tenth of an acre of the Shinnecock Wetlands.  *Id.* ¶ 29.  According to the Government, Defendant and/or

other persons acting at his direction used mechanized earthmoving equipment to discharge fill material primarily consisting of construction and demolition debris as well as gravel, dirt and landscaping material -- all of which constitute pollutants as defined in the CWA -- into the Wetlands. *Id*. ¶¶ 30, 31. The Defendant did not obtain a CWA Section 404 permit from the Secretary of the Army for the discharge of fill material into waters of the United States. *Id*. ¶ 34(a).[1] The discharge of fill material had the effect of expanding upland areas by replacing tidal wetlands bordering Heady Creek with dry land. *Id*. ¶ 35.

On March 1, 2017, in accordance with CWA Section 308, 33 U.S.C. § 1318, the EPA sent a Request for Information requiring the Defendant to, among other things, compile a list of all contractors who dumped fill material at the Property. *Id*. ¶ 37. A response was required within 15 days of receipt. *Id*. Defendant did not respond within the 15 days nor at any time thereafter. *Id.* ¶ 38. The EPA issued an Administrative Compliance Order on May 3, 2017 which directed the Defendant to respond to the Request for Information; remove all unauthorized fill material; restore the Shinnecock Wetlands to their pre-violation condition; and submit a restoration plan and obtain the EPA's written approval for the plan. *Id*. ¶¶ 38, 39. The Defendant did not comply with the Administrative Compliance Order or take any actions to restore the Shinnecock Wetlands to their pre-violation condition. *Id.* ¶ 41.

## III.    THE PRELIMINARY INJUNCTION HEARING

At the outset of the proceedings on July 18, 2018, the Court reiterated that the Government was seeking a preliminary injunction "first of all to restrain the defendant and those

---

[1]    There appears to be a typographical error in the numbering of the paragraphs in the Complaint. Paragraph 34 is followed by paragraph "38" which should actually be paragraph 35. The next paragraph is also numbered 35. For reference purposes and for clarity, the Court is designating the first paragraph "38" as paragraph 34(a).

individuals acting in concert with him from placing fill material into the waters of the United

States from his allotment of land located at 5 East Creek Way on the eastern shore of the

Shinnecock Indian Nation territory within the geographic boundaries of the Town of

Southampton."  Transcript of the July 18, 2018 Preliminary Injunction Hearing at 2.[2]   The Court

further noted that the Government was seeking an order pursuant to Fed. R. Civ. P. 26(d)(1) for

limited expedited discovery requiring the Defendant to disclose information updated to the

present that the EPA requested through its May 1, 2017 Request for Information ("RFI").  Tr. I

at 3.  The Government stated that it was seeking both forms of relief simultaneously.

When the Court asked Defendant Smith if he wished to be heard, he responded that he

had built his house in 1982 and began constructing a barrier in front of it.  *Id*. at 4.  He stated that

no one from the tribe had come to him for assistance or anything.  *Id*.  So he took it upon himself

> to do this for my own safety and the security of my house.  During
> Hurricane Sandy, the water came right up into one of my garages
> and destroyed quite a bit of tools, refrigerator, and other items, and
> never once has anyone come to see if I needed assistance or outpour
> or anything from the tribe.  All right?  I think they were very
> neglectful in their – how can I say it – secure of the tribe members,
> in securing the safety of tribe members and materials.
>
> As far as any coming to me, the only time they did was when the
> DEC came down there and told me to stop doing what I was doing.
> At that point in time, no one has come [some] to me to provide any
> help or anything.

*Id*. at 4-5.  Defendant Smith also advised that he did not bring any witnesses to testify at the

hearing.  *Id*. at 6.  The Court then explained how the hearing would proceed, including the fact

that the Defendant would have the opportunity to cross-examine any of the witnesses the

---

[2]    All subsequent references to the record of the July 18, 2018 Preliminary Injunction
Hearing are designated "Tr. I at ___ ."

Government presented and would also have the opportunity to give some closing remarks when the testimony was completed.  *Id*. at 6-7.

### A.     The Government's Witness Stephanie Andreescu

Stephanie Andreescu is an environmental scientist and a credentialed Clean Water Act inspector serving in Region II of the EPA.  Tr. I at  11; *see also* Declaration of Stephanie Andreescu in Support of the United States' Motion for Preliminary Injunction ("Andreescu Decl.") [DE 10-1], attached as Ex. 1 to the Govt.'s Mot, ¶ 1.[3]  She received a Bachelor of Arts degree in biology with studies in environmental management from Cornell University and in 2006, she completed a Masters of Environmental Management degree from Duke University where she specialized in wetlands work.  *Id*. at 11.  Before going to the EPA, Ms. Andreescu did a fellowship with EPA Region II and later served as an environmental consultant with a consulting firm doing wetlands evaluations and delineations.  *Id*.  She testified that she did an inspection at the Shinnecock territory connected with this case.  *Id*. at 13.  Prior to this matter, she had conducted approximately 30 – 50 wetlands inspections.  *Id.*  She is a professional wetlands scientist with a Clean Water Act certification.  *Id*.

According to Andreescu, wetlands are defined by statute as "areas that are inundated or saturated with either groundwater or surface water with a frequency and duration that supports wetlands vegetation that's adapted to wetland soils."  *Id*. at 14.  She was assigned by her supervisor to examine the site in the Shinnecock territory for potential violations of Section 404 of the Clean Water Act.  *Id*. at 14-15.  It had come to the EPA's attention that the Shinnecock

---

[3]     For ease of reference, it was agreed that the exhibits annexed to the Andreescu Declaration would be introduced under the same numbers at the preliminary injunction hearing. *See* Tr. I at 9:23-10:10.  Defendant Smith confirmed that he had received the Government's motion and materials prior to the hearing.  *Id*. at 8.

had observed some dumping areas on the territory and they wanted the EPA to look into them. *Id*. at 15.  Ms. Andreescu's testimony covered the following areas.

### 1.    The Property

Along with others, Andreescu went to conduct the CWA Section 404 inspection (the "Inspection") of the Property at East Creek Way in Southampton on June 30, 2016.  Tr. I at 15. To prepare for the inspection, Andreescu coordinated with the U.S. Army Corps of Engineers to determine if any permit had ever been issued at the Property and viewed years of aerial imagery. *Id.* at 16.  Andreescu learned that Defendant Smith had not applied for a permit and no permit had ever been issued.  *Id*. at 16-17.

The Property is bordered by tidal wetlands associated with Heady Creek.  *See* Andreescu Decl. ¶ 8; Tr. I at 29.  Heady Creek is an arm of Shinnecock Bay, which is a tidal embayment of the Atlantic Ocean.  Andreescu Decl. ¶ 8.  Specifically, Heady Creek, by way of the Shinnecock Inlet — a shallow water area of the Shinnecock Bay — flows to the Atlantic Ocean.  Andreescu Decl. ¶ 8; Tr. I at 31:16-22.  The Property has a continuous surface connection to Heady Creek which is subject to the ebb and flow of the tide.  Andreescu Decl. ¶ 8. As a result, the Property is subject to the jurisdiction of Section 10 of the Rivers and Harbors Act and is considered a navigable water and a "water of the United States" under the CWA.  *Id*.; Tr. I at 30:20-31:18.

### 2.    The EPA Inspection

On June 30, 2016, at the Request of the Shinnecock Nation Council of Trustees, the EPA conducted the CWA Inspection of the Property.  Andreescu Decl. ¶ 9 and Ex.1 (EPA Inspection Report); Tr. I at 15.   Representatives of the Shinnecock Nation, the Army Corps of Engineers and the EPA accompanied Andreescu to the Inspection.  Tr. I at 18.  The purpose of the site visit was to document whether or not fill material was discharged into waters of the United States.  *Id*.

7

The group walked through the wetlands and Andreescu took some photographs. *Id.* at 19. They took some soil samples and Andreescu testified that the fill material "was like an extension of [Defendant's] property" and was in the wetlands. *Id*. at 20. In describing the fill material, Andreescu stated that "there were rocks and dirt." *Id*. at 21. "But there were also construction demolition materials, including concrete, concrete slabs, rebar, just large pieces of construction materials there. Also, landscaping material." *Id*. The material covered about a tenth of an acre of the wetlands and it qualified as a pollutant. *Id*.

Andreescu testified that she was familiar with the term "point source" in the Clean Water Act and described it as "a discreet conveyance, as opposed to like a nonpoint source, like storm water runoff. So one example is like a pipe. That would be a discreet conveyance." *Id.* at 22. Andreescu determined that the fill had been entirely discharged into the wetlands using point source based on the size and quantity of the material at the site which could not entirely have been put there manually. *Id*. She later received information that trucks were coming to the property to dump. *Id*.

The Government showed Ms. Andreescu a number of photographs that she had taken during the Inspection. She testified that Exhibit 3 showed the concrete material that had been discharged into the wetland area along with some construction, demolition and landscaping material. *Id*. at 25. A group of nine additional photographs Andreescu took during the Inspection were introduced as Exhibit 4 and she testified that they each show different views of the fill material in the wetlands. *Id*. at 27.

The group also dug two sample pits using an auger to determine the types of soils at the site. *Id.* at 28. Andreescu testified that a wetland requires not only hydrology and vegetation but it requires wetland soil. *Id.* They wanted to confirm that all three of those parameters were in

place. *Id*.  Both locations exhibited the scientific characteristics of wetlands in addition to the presence of hydrophytic vegetation and hydric soils.  Tr. I at 28-30; Andreescu Decl. ¶ 10 and Ex. 1.  The EPA also verified and documented the unauthorized discharge of fill materials into the subject wetlands bordering Heady Creek.  *See* Andreescu Decl. ¶¶ 11-12 and Ex. 1; Tr. I at 20-22.  Based on its observations and photographs, the EPA determined that "approximately one-tenth of an acre of fill material, consisting primarily of construction and development debris (such as bricks, rebar, and concrete), as well as gravel, dirt and landscaping material (such as sod, branches, and shrubs) had been discharged into a tidal wetland."  Andreescu Decl. ¶ 12 and Ex. 1.  The presence of fresh landscaping material indicated that the unauthorized filling was ongoing.  *Id.* and Exs. 1 and 3 (Photo P6300016).

Andreescu further testified that wetlands are a type of waters of the United States.  *Id.* at 31.  To be found as such, wetlands have to have a connection to a navigable water.  In this case, according to the guidance used by the EPA, Heady Creek is subject to the ebb and flow of tide and the wetlands that are at the site are adjacent to Heady Creek.  Heady Creek flows into Shinnecock Bay which flows into the Atlantic Ocean.  *Id.*

After the Inspection, the group returned and spoke to the Shinnecock representatives about what they found and talked about next steps.  *Id.* at 33.  The Shinnecocks wanted to resolve the issue but they wanted to try to do so internally at first.  *Id*.  They asked for a summary of Andreescu's findings to bring to Defendant Smith "to see if he would understand that what he was doing was detrimental."  *Id.*  During her testimony, Andreescu was shown Exhibit 1 of her Declaration which she identified as a summary of her inspection report.  *Id.*  She also identified a letter signed by former EPA Regional Judith Enck to which Andreescu's memorandum was attached.  *Id.* at 34.  The memorandum summarized Andreescu's inspection findings and talked

about the importance of the wetlands and Shinnecock Bay and the damages that putting fill material in wetlands causes to the ecosystem. *Id*. Andreescu understood that the memorandum had been sent to the Shinnecock leaders. *Id.* at 35.

### 3.  *Defendant's Non-Compliance*

At the time of the inspection, the Tribal Council had planned to meet with Defendant to discuss the results of the EPA findings, to help the Defendant understand the detrimental effects of his actions, and to offer assistance to help him achieve compliance with the CWA.  To that end, the EPA sent a letter on July 22, 2016 to Bryan Polite, then Chairman of the Shinnecock Nation Tribal Council, enclosing Investigator Andreescu's memorandum, which summarized the findings from the inspection.  The letter also discussed potential impacts of the fill on the aquatic system.  Tr. I at 34-35.[4]  On September 12, 2016, the Tribal Council issued an Order to Cease and Desist, directing Defendant to stop the illegal filling of wetlands on the Property.  The Cease and Desist Order was delivered to the Defendant by the Tribal Council, together with a copy of the EPA's July 22, 2016 Letter.  Andreescu Decl. ¶ 16 and Ex. 6 (September 12, 2016 Cease and Desist Order with enclosures); Tr. I at 35.  The Cease and Desist Order further demanded that Defendant meet with the Tribal Council on September 15, 2016.  Andreescu Decl. ¶ 16.

On October 6, 2016, the Tribal Council participated in a conference call with the EPA and the U.S. Department of Justice, during which the Tribal Council advised the EPA that Defendant had refused to comply with their demands as set forth in the Cease and Desist Order. *Id.*; Tr. I at 35.  Andreescu participated in that conference call.  Tr. I at 35.  During the call, the Tribal Council further advised the EPA that Defendant's neighbors had witnessed Rafael

---

[4]    The Letter and Memorandum are annexed to Andreescu's Declaration as Exhibit 5. *See* Andreescu Decl., Ex. 5 (July 22, 2016 EPA Letter and enclosed memorandum).

Valdespino, owner and president of Valdespino & Associates, or other persons associated with Valdespino & Associates, engaging in dumping activity on the Property.  Andreescu Decl. ¶ 19; Tr. I at 37.  Andreescu testified that the Shinnecock representative they had spoken to had video evidence and photographic evidence that Valdespino or his company had been dumping at the site.  Tr. I at 37.  Thereafter, by letter dated October 11, 2016, the Tribal Council advised the EPA that it was unable to resolve the matter with Defendant and formally requested that the EPA exercise its enforcement authority to remedy the matter.  Andreescu Decl. ¶ 18 and Ex. 7 (October 11, 2016 Tribal Council Letter to EPA); Tr. I at 36-37.

### 4.    *The November 10, 2016 Request for Information*

Following the Tribal Council's request for EPA enforcement, the EPA sent a Request for Information ("RFI") dated November 10, 2016 to Rafael Valdespino, requesting information concerning his activity on the Property.  Tr. I at 37; Andreescu Decl. ¶ 19 and Ex. 8(RFI to Valdespino).  Valdespino responded to the RFI on December 26, 2017 and stated that his company had dumped a total of 118 cubic yards of fill material consisting of a "mix of loam, clay, and sand" at the Property in December of 2015 and October of 2016.  Tr. I at 38; Andreescu Decl. ¶ 20 and Ex. 9 (Valdespino RFI Response Letter).

Based on Valdespino's response, Andreescu and the other EPA representatives concluded that there were other contractors or individuals providing material at the site.  Tr. I at 39.  On March 1, 2017, the EPA sent an RFI to Defendant Smith (1) advising him of the EPA's investigation into unauthorized dumping of fill material into wetlands on the Property; (2) setting forth the EPA's authority for the investigation/RFI; and (3) requesting, among other things, a description of the fill material dumped on the Property, the dates any such fill material was dumped, and a list of the contractors who had engaged in the dumping.  Tr. I at 39; Andreescu

Decl. ¶ 21 and Ex. 10 (RFI to Defendant).  The RFI directed Defendant to contact Ms.

Andreescu with any questions and was signed by Richard Balla, the Chief of the Watershed

Management Branch of Region 2 of the EPA.  Tr. I at 41; Andreescu Decl., Ex. 10.  In response

to the RFI, on March 10, 2017, Defendant telephoned Richard Balla and stated in sum and

substance, "you've got your info . . . if you want to go to court, I'll take you to court and sue

you."  Andreescu Decl. ¶ 22 and Ex. 11 (Richard Balla Summary of Call with Defendant); Tr. I

at 42.

Defendant never provided any of the information requested in the RFI.  Andreescu

drafted an Administrative Compliance Order ("ACO") and on May 3, 2017, the EPA issued that

ACO, Docket # CWA-02-2017-3502, pursuant to Section 309(a) of the CWA.  Tr. I at 43;

Andreescu Decl. ¶ 23 and Ex. 12 (ACO).  In the ACO, the EPA (1) set forth the bases for its

enforcement authority; (2) summarized the facts as determined by the EPA's investigation into

unauthorized dumping of fill material into wetlands on the Property, and (3) directed Defendant

to cause no discharges of dredged or fill material, to remove all unauthorized fill material, and to

restore the wetlands to their pre-violation condition.  Andreescu Decl. ¶ 23 and Ex. 12; Tr. I at

44-45.  Andreescu testified that the findings in the ACO were based on her observations from the

inspection, the photographs that were taken and the facts of the case.  Tr. I at 44-45.  The EPA

wanted Defendant Smith to submit a restoration plan within 15 days to remove the fill material

and restore the wetlands to how they were prior to being disturbed.  Tr. I at 45; Andreescu Decl.

Ex. 12.  The ACO also informed Defendant Smith that if he could not comply with the deadlines

in the Order, he should immediately notify Ms. Andreescu by email that he could not meet the

deadline.  Tr. I at 46.  Defendant did not respond to the ACO nor did he take any remedial action

to restore the wetlands.  Andreescu Decl. ¶ 24; Tr. I at 46.  After introducing several other exhibits, counsel for the Government concluded Ms. Andreescu's testimony.

### 5.    *Defendant's Continued Violations*

As recently as February 13, 2018, Shinnecock Nation Tribal Council members informed the EPA that earth-moving activity was being conducted on the Property in violation of the May 3, 2017 ACO.  Andreescu Decl. ¶ 24.  Further, on February 27, 2018, the EPA received a letter from the Tribal Council with a photograph depicting additional fill material which had been brought onto the Property.  *See id.* ¶ 26 and Ex. 14 (February 27, 2018 Letter with photo attachment).  Significantly, Defendant recently erected a fence upon the Property, preventing Shinnecock Nation members from observing his activities, including whether he continues the unauthorized dumping of fill materials into the wetlands.  Andreescu Decl. ¶ 27.  To date, Defendant has not obtained a permit from the U.S. Army Corps of Engineers for his activities. *Id.* ¶ 28.

The EPA maintains that the wetlands at issue perform important ecological functions throughout the year.  *Id.* ¶ 33.  The Shinnecock Bay, which includes Heady Creek, is designated by the New York State Department of Environmental Conservation as a Significant Coastal Fish and Wildlife Habitat and is one of the largest estuarine ecosystems in New York State.  *Id.* ¶ 29. The marshes and tidal flats, like those adjacent to the Property, serve as nursery and feeding grounds for many fish found in the bay, wintering areas for important waterfowl, and home to shellfish, the harvest of which is important to the region.  *Id*. ¶ 31.  Further, the marshes and tidal flats reduce wave energy and protect the shoreline from erosion.  *Id*.  The discharge of fill material into these wetlands diminishes the extent to which the wetlands can perform these functions and maintain healthy aquatic ecological communities.  *Id*. ¶ 33.

### B.    Status at Conclusion of July 18, 2018 Hearing

After a recess during the July 18, 2018 hearing, the Court spoke with Defendant Smith about his right to cross-examine Ms. Andreescu.  Tr. 1 at 50.  Defendant Smith stated that he wanted to "postpone this hearing until I can get, you know, services."  *Id.*  He added that he wanted to have "proper legal representation."  *Id*.  The undersigned then conferred with Judge Spatt who agreed to give Defendant Smith "a very brief period of time to accomplish that."  *Id.* at 51.  After hearing from both sides, the Court adjourned the hearing to August 14, 2018 at 10 a.m.  Defendant Smith represented on the record that in the interim, he would not put any material into the wetlands on top of the material that is already in the wetlands.  *Id.* at 55.  The Court advised Mr. Smith that when he returned with an attorney, his counsel would be expected to start cross-examination of Ms. Andreescu.  *Id.* at 56.  If he did not retain an attorney by that time, Defendant Smith would be required to return for the hearing and proceed *pro se.*  It would be up to him to decide if he wished to cross-examine the witness and whether he wished to present any witnesses on his own behalf.  *Id.* at 57.  He was further advised that if an attorney did not appear on his behalf and he did not appear, he would be running the risk of the Government seeking to make a motion for entry of a default judgment against him.  *Id.*

## IV.    THE CONTINUED HEARING ON AUGUST 14, 2018

Defendant Smith appeared on August 14, 2018, but without an attorney.  He acknowledged that he had received a copy of the transcript from the July 18, 2018 hearing.[5]

---

[5]    All subsequent references to the record of the August 14, 2018 Continued Preliminary Injunction Hearing are designated "Tr. II at ___ ."

Transcript of the August 14, 2018 Continued Preliminary Injunction Hearing at 62.  When the Court inquired whether Mr. Smith wished to cross-examine Ms. Andreescu, he initially responded that he did not.  Tr. II at 63.  He then stated:

> I'd just like to state that I'm a member of the Shinnecock Nation, the Shinnecock tribe.  We are a sovereign nation.  We are self-governed and we have been that way since the beginning of time.  I see a clear-cut violation of my ancestral rights by trying to impose a penalty on me on my tribal land.  In the boundaries by Southampton Town, our property, or our territory extends halfway down Heady Creek and on the east – on the west side is 500 feet out.  This is a clear-cut violation of my trial ancestral rights and it's not right to be here, sitting here.

*Id.*  The Court informed Defendant Smith that the hearing was continuing at that point and that Ms. Andreescu was present and he had the opportunity to ask her questions.  *Id.* at 64.  The Defendant was further advised that this was his only opportunity to make a record during the hearing if he wished to ask the witness questions, at which point the Defendant stated he would ask some questions.  *Id*.

Defendant Smith then asked the witness was it not true that the original invitation to come to the reservation was not to make a judgment on his property.  *Id.* at 67.  Andreescu answered that the original purpose of the Inspection was to document potential fill material that had been deposited in potential wetlands on the property.  *Id.*  When asked to identify those materials, Andreescu responded that it was concrete, wood debris, some landscaping material, rebar, construction and demolition material.  *Id.*  Defendant Smith then made a statement that he personally knew there was "nothing as far as construction or demolition – as far as wood or stuff like that goes" and that the only thing he put on the reservation was "concrete and there was some brush leaves and stuff that naturally fall from the trees, piled up there.  So it would decay and build soil."  *Id.*  The objection of counsel for the Government was sustained and Mr. Smith

was cautioned that *he* was not testifying.  *Id.*  Rather, he needed to ask questions of the witness.

*Id.* at 67-68.  The Defendant then asked whether concrete is normally used along the shorelines.

*Id.* at 68.  Andreescu answered that in certain circumstances, if a permit is applied for with the

US Army Corps of Engineers, it may be permissible to use hard armoring such as concrete to

minimize or prevent erosion.  *Id.* at 69.  The Defendant then stated "[t]hat's just what I was

doing, building up my property."  *Id*.  The Court reminded Defendant that he was testifying

again, at which point he said he had no more questions.  *Id.*

The Government then rested.  Defendant Smith called his sister-in-law Kim Smith to

testify.  *Id.* at 70.  His first question to the witness was "I'd just like to have you express your

feelings on the whole situation here, I guess."  *Id.* at 71.  The Court advised Mr. Smith that

(1) this approach was highly unusual, but that the Court would allow the witness to respond, and

(2) after that, however, he had to ask questions to get at the facts.  The witness responded as

follows:

> The fact is my concern why I even came to him was because what I
> was trying to say – well, I believe that he's trying to say, we are
> saying she identified our territory waters as the United States
> wetlands.  These waters are the Shinnecock waters in Heady Creek
> and it has always been because we are not a trustee based tribe.  We
> never gave up our rights to these waters, and I just wanted to make
> that statement.

*Id.* at 72.  The Court then advised Defendant Smith that he could proceed with his questions, at

which point he responded "I don't know what to ask.  That's it for me.  Thank you."  *Id.* at 72-

73.  Shortly thereafter, Defendant Smith stated that he wanted his sister-in-law to be able to ask

some questions on his behalf and was that possible.  *Id.* at 74.  The Court pointed out that Kim

Smith is not an attorney and is not a party to this action and therefore could not ask questions.

*Id.*

16

When the Court inquired whether Defendant Smith was calling anyone else as a witness, Smith stated that he himself was going to testify. *Id.* at 76. The Court permitted Defendant Smith to testify in a narrative format and directed that he focus on the testimony and exhibits that the Government had introduced and to address the Government's allegations. *Id.* at 77. The following exchange then took place:

THE COURT:      You may proceed.

DEFENDANT:      I'd like to know how they could come and inspect my property and have a  set of standards that they have and then – without any notification, how can they ask to impose a fine on me without giving me any idea of what I was supposed to do?

How can someone come in and say it's wrong.  You are going to be fined, without letting the individual know what should have been done?  It just doesn't make sense.  How can that be?

THE COURT:      Well, you say you weren't given notice.  Maybe you want to talk more about that.

DEFENDANT:      They may have sent me some papers, but no one came – after Hurricane Sandy, the water was up in my garages, you know, and this is caused from the hurricane low level.  So I built the property up to prevent this from happening again.  I lost equipment, tools, you know.  I'm looking out for my own safety, you know, to continue to have a livelihood.  It's my only income so what I do at my home, and I have to live, you know.

*    *    *

THE COURT:      Did you do anything when you got the notices?

DEFENDANT:      Did I do anything?

THE COURT:      Did you contact anybody?

DEFENDANT:      I was pretty much done.  I had been putting this wall up, barrier, since 1983, been doing it, and I do it from friends, you know, having material, concrete, breaking up foundations and stuff when they do them they come in and they put the stuff in.  This has been going on since 1983, '82, you know, and no one's ever come to me

17

|                |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
|----------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                | and said I was doing something wrong.  Then when I'm finished, then they come in.  Doesn't make sense. |
| THE COURT:     | What other facts do you want me to know that's become part of the record here? |
| DEFENDANT:     | The fact is I don't know where they think they have – we are a sovereign nation.  We have been that way since time.  And for them to say they own the shoreline, or whatever, is ridiculous because clearly only your tax records, your maps, or whatever, it shows a line halfway going down Heady Creek and I have been in litigation with the courts in Southampton because of a coming on the property, using motors to dredge clams, and they put on the judgment that the clammer, our property goes to 500 feet on the bayside and halfway down Heady Creek.  So how do they have the authority to come up there and tell me what I'm doing on my shoreline.  It doesn't make sense. |
| THE COURT:     | Any other facts you want to put on the record? |
| DEFENDANT:     | Fact are it's 500 feet on the west side of Shinnecock on the water and halfway down Heady Creek, which is on the east side.  And that's our territory, our boundaries.  It was established by the State of New York and Southampton town, and whoever, you know.  It just doesn't make sense. |
| THE COURT:     | So if I understand this, you are saying that you don't believe that your property and you are subject to the jurisdiction of the United States. |
| DEFENDANT:     | Exactly. |
| THE COURT:     | Okay.  Any other facts you want to – |
| DEFENDANT:     | We were here before the United States existed.  How can you come in – well, it's been done, but it's time to stop, you know. People are people. |
| THE COURT:     | Is there anything you want to put on the record about the types of materials that are on the property? |
| DEFENDANT:     | The types of materials was concrete and, as she said, rebar, but there was leaves and stuff which naturally fall from the trees.  We have shrub oak, and stuff, you know, and I blow it over there, you know, put it over there just so that it would decay and build into the concrete and that's exactly what it's been doing.  The part I had |

18

> done earlier, you can't even tell that there is a berm there because of the brush and stuff that's going up there.
>
> So I know what it's done. It's been done since 1983, '82, you know, and there's been no harm done. I have a big garden where I get my vegetation, food from, and I eat the clams in front of the house, you know. There's nothing. I'm still here, you know. I'm 62 years old; just doesn't make sense.

THE COURT:          Is there anything else that you would like to put on the record?

DEFENDANT:          No.

Tr. II at 78-81. Counsel for the Government did not cross-examine Defendant Smith. At that point, the Court gave both parties the opportunity to give a closing statement after which the hearing record was closed. *Id.* at 82-92.

## V.    THE STANDARD OF REVIEW

The objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. *See* 33 U.S.C. § 1251; *United States v. Acquest Transit LLC*, No. 09-CV-055S, 2009 WL 2157005 at *1 (W.D.N.Y. July 15, 2009) ("The purpose of the CWA is to 'restore and maintain the integrity of the Nation's waters.'") (citing 33 U.S.C. § 1251). With respect to remedies, the CWA provides as follows:

> **(b) Civil actions**
>
> The Administrator is authorized to commence a civil action for appropriate relief, ***including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a)*** of this section. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given immediately to the appropriate State.

33 U.S.C. § 1319 (emphasis supplied).

The purpose of a preliminary injunction is to "preserve the status quo [between the parties] pending the final determination of a dispute." *Arthur Guinness & Sons PLC v. Sterling Publ'g Co.*, 732 F.2d 1095, 1099 (2d Cir. 1984) (citing *7 Moore's Federal Practice* ¶ 65.04[1] (1982)).  "District courts may ordinarily grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) 'that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) (per curiam)); *Riddick v. Maurer*, 730 Fed. App'x 34, 37 (2d Cir. 2018) (summary order); *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010); *Napolitano v Ryder,* CV 18-3607, 2019 WL 365710, at *4 (E.D.N.Y. Jan. 30, 2019).

However, "in certain circumstances, generally when the party seeks a statutory injunction, we have dispensed with the requirement of showing irreparable harm, and instead employ a presumption of irreparable harm based on a statutory violation." *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F. 3d 115, 120 (2d Cir. 2010); *see United States v. Diapulse Corp. of America*, 457 F.2d 25, 27 (2d Cir.1972) ("the function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants").  Indeed, where the government seeks to enforce a statute designed to protect the public interest, it is not required to show irreparable harm to obtain injunctive relief. *See Golden Feather Smoke Shop, Inc.*, 597 F.3d at 120; *Acquest Transit LLC*, 2009 WL

2157005, at *1.  Nor is the Government required to show that immediate harm will occur absent injunctive relief.  *See Diapulse Corp. of America*, 457 F.2d at 28.  This is partly because the passage of such a statute, "is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained."  *Id.* at 27.  Instead, where the government moves for injunctive relief expressly authorized by statute, "the government need only show that a defendant has violated a federal statute and that there is some reasonable likelihood that the violation may recur."  *Acquest Transit LLC*, 2009 WL 2157005 at *1 (granting government's application for injunctive relief for violations of the CWA).

## VI.    DISCUSSION

### A.    Violations of the CWA

Section 301 of the CWA prohibits "the discharge of any pollutant by any person" unless authorized by permit, where "the discharge of any pollutant" includes the "addition of any pollutant to navigable waters from any point source." 33 U.S.C. §§ 1311(a), 1362(12).   As the court in *Acquest* observed:

> "Discharge of any pollutant" includes "any addition of any pollutant to navigable waters from any point source." [33 U.S.C.] § 1362(12). The term "pollutant" is defined broadly to include traditional contaminants and also "dredged spoil, ... rock, sand, [and] cellar dirt." [33 U.S.C.] § 1362(6). A "point source" includes "any discernible, confined and discrete conveyance." [33 U.S.C.] §1362(14). And, finally, "navigable waters" is defined as encompassing all "waters of the United States, including the territorial seas." [33 U.S.C.] § 1362(7).

*Acquest Transit LLC*, 2009 WL 2157005 at *2

To establish liability for a CWA wetlands violation, the Government must prove that (1) Defendant Smith is a person within the meaning of the CWA, (2) Defendant Smith's activities constituted a discharge of pollutants from a point source, (3) the site was a wetland at the time of

the discharge, (4) the site constituted waters of the United States at the time of the discharge, and (5) the activities at the site were conducted without a permit. *See Acquest Transit LLC*, 2009 WL 2157005, at \*3 (citing *United States v. Brace,* 41 F.3d 117, 120 (3d Cir.1994)). In order to determine whether the Government has established Defendant's liability for a CWA wetlands violation, the Court considers each element in turn.

### 1.  Person

The CWA defines "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). Defendant Smith as an individual falls within this definition and he has not contested that fact. He appeared on his own behalf at the preliminary injunction hearing. *See generally* Tr. I  and Tr. II. Thus, Defendant Smith is a "person" within the meaning of the CWA.

### 2.  Discharge of Pollutants from a Point Source

The CWA broadly defines "pollutant" to include traditional contaminants like "solid waste . . . sewage, garbage . . . and chemical wastes" *as well as* "dredged soil . . . rock, sand, cellar dirt . . . and agricultural waste." 33 U.S.C. § 1362(6). "Point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well . . . or vessel . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Under existing caselaw, the use of mechanized equipment in wetlands resulting in the placing of dirt, sand, gravel or other materials into the waters of the United States constitutes the "discharge of a pollutant from a point source" within the meaning of the CWA. *See, e.g.*, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983) (holding that the use of bulldozers and backhoes for land-clearing which results in the deposit of vegetation in wetlands constitutes "discharge from a point source"); *see also Acquest Transit*

*LLC*, 2009 WL 2157005 at *5 (collecting cases and stating "[b]ulldozers, loaders, backhoes, or dump trucks that deposit or spread fill material are point sources").

As to a "pollutant," the evidence shows that on June 30, 2016, the EPA conducted an inspection of the Property, during which the EPA observed and documented approximately one-tenth of one acre of fill material, consisting of construction and demolition debris and landscaping materials, which had been discharged into tidal wetlands. *See* Tr. I at 20-22; Andreescu Decl. ¶¶ 11-12 and Ex. 1 (EPA Inspection Report). The EPA's observations as to the content of the fill material is consistent with Valdespino's RFI Response Letter, which acknowledges that Valdespino dumped 118 cubic yards of loam, clay, sand, and dirt onto the Property (Andreescu Decl. ¶¶ 20 and Ex. 9 (Valdespino RFI Letter); Tr. I at 38-39), *and* Defendant's own testimony that concrete and broken up foundations as well as rebar and landscaping fill were dumped onto the Property (Tr. II at 79, 81). The EPA's observations are also documented in the photographs admitted into evidence which depict large piles of concrete, bricks, dirt and other construction debris dumped on the wetlands at issue. *See, e.g.*, Andreescu Decl. Ex. 4, Photographs P6300006-P6300009, P6300016, P6300021-P6300024. In light of this evidence, the Court finds that the subject fill material is a "pollutant" within the meaning of the CWA.

With respect to "point source," given the EPA's observations as to the volume, size, nature and extent of the fill material observed on the Property, the EPA determined that the fill material could not have been discharged without the use of mechanized equipment. Andreescu Decl. ¶ 13; Tr. I at 22. The EPA's determination is consistent with other evidence submitted to the Court. For example, Valdespino's RFI Response Letter concedes that Valdespino dumped *118 cubic yards* of fill material onto the Property, an indisputably large amount of material

requiring the use of mechanized equipment for transport and discharge.  Andreescu Decl. ¶ 20

and Valdespino RFI Response Letter; Tr. I at 38-39.   Although the EPA was not present to

observe how the discharge occurred, it is apparent that these materials could not have been

deposited at the location manually.  In addition, Defendant admitted during his narrative

testimony that he and friends have been dumping materials, including "concrete," "foundations,"

and "rebar," which, by their very nature, also require the use of mechanized equipment for

transport and discharge. *See* Tr. II at 79, 81.  Further, as noted, the photographs submitted to the

Court clearly depict large piles of concrete, bricks, dirt and other construction debris — fill

material which would have required the use of mechanized equipment. *See, e.g.*, Andreescu

Decl., Ex. 4 (Photographs P6300006-P6300009, P6300016, P6300021-P6300024).  Based on this

evidence,  the Court finds that Defendant discharged pollutants from a point source within the

meaning of the CWA.

### 3.     *The Site as a Wetland*

The term "navigable waters" is defined as "waters of the United States, including the

territorial seas."  33 U.S.C. § 1362(7).  According to federal regulations interpreting "waters of

the United States," "navigable waters" include, in relevant part, (i) "all waters which are

currently used, were used in the past or may be susceptible to use in interstate or foreign

commerce, including all waters which are subject to the ebb and flow of the tide"; and

(ii) wetlands adjacent to such waters.  33 C.F.R. § 328.3(a)(1) and (6).  Under 33 C.F.R.

§ 328.3(c)(4), "wetlands" are defined as "those areas that are inundated or saturated by surface or

groundwater at a frequency and duration sufficient to support, and that under normal

circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil

conditions."  33 C.F.R. § 328.3(b).

Here, at the site inspection conducted by the EPA on June 30, 2016, several locations were inspected and sampled to determine whether they fulfilled the characteristics of wetland hydrology, hydric soils, and wetland vegetation.  Andreescu recorded data from soil samples from two different locations on the periphery of the fill area, and both locations showed the characteristics of wetlands as well as the presence of hydrophytic vegetation and hydric soils. Tr. I at 28-30; *see* Andreescu Decl. ¶¶ 9-14 and Ex. 1 (EPA Inspection Report); Ex. 3 (Photo P6300016); Ex. 4 (photographs P6300006 - P6300009, P6300016, 6300021- P6300024); and Ex. 5 (July 22, 2016 EPA Letter and enclosed memorandum).  Andreescu described at length during her testimony and in the Inspection Report the soil quality, hydrology and plant life on which the materials were deposited, and concluded that the Property was wetlands.  Accordingly, based on the evidence presented here, the Court finds the area at issue satisfies the definition of wetlands set forth in 33 C.F.R. § 328.3(b).

### 4.        *Waters of the United States*

Wetlands meeting the regulatory definition of 33 C.F.R. § 328.3(c)(4), which are adjacent to navigable-in-fact waters, constitute a "water of the United States."  *See* 33 C.F.R. § 328.3(a) (definition of "waters of the United States").  Under 33 C.F.R. § 328.3(c), "adjacent" is defined as "bordering, contiguous or neighboring."  Andreescu testified that the wetlands on the Property border Heady Creek, a relatively permanent body of water that is subject to the ebb and flow of the tide and is therefore a "navigable water" as defined by Section 502(7) of the Act, 33 U.S.C. § 1362(7).  Tr. I at 29.; Andreescu Decl. ¶ 8 and Ex. 1 (EPA Inspection Report at 1-2).  Further, Heady Creek abuts into Shinnecock Inlet which flows into Shinnecock Bay, which in turn flows to the Atlantic Ocean.  *Id.*  Significantly, Shinnecock Bay and Heady Creek were used in the past, or may be susceptible to use, in interstate or foreign commerce or are adjacent to waters

used in the past or susceptible to use, in interstate or foreign commerce.  Thus, Shinnecock Bay

and Heady Creek are "waters of the United States" and "navigable waters" under CWA 502(7),

33 U.S.C. § 1362(7), and 33 C.F.R. § 328.3(a).

Because the wetlands on the Property are adjacent to a traditionally navigable water

(Heady Creek and Shinnecock Bay), they are covered by CWA § 404.  *See United States v.*

*Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985) ("the language, policies, and history of

the Clean Water Act compel a finding that the Corps has acted reasonably in interpreting the Act

to require permits for the discharge of fill material into wetlands adjacent to the 'waters of the

United States'").  The Supreme Court issued a decision in *Rapanos v. United States*, 126 S. Ct.

2208 (2006), which addressed protection of wetlands under the CWA, but which generated no

majority opinion.  Unlike the instant case, *Rapanos* concerned wetlands that were adjacent to

waters that were not themselves navigable-in-fact.  *See Catskill Mountains Chapter of Trout*

*Unlimited, Inc. v. Envtl. Protec. Agency*, 846 F.3d 492, 518 (2d Cir. 2017) ("[i]n *Rapanos*, a

plurality of the Supreme Court rejected the EPA's interpretation of the Clean Water Act as

providing authority to regulate isolated wetlands lying near ditches or artificial drains that

eventually empty into "navigable waters"), *cert. denied sub nom. New York v. E.P.A.*, 138 S. Ct.

1164, 200 L. Ed. 2d 314 (2018), and *cert. denied sub nom. Riverkeeper, Inc. v. E.P.A.*, 138 S. Ct.

1165, 200 L. Ed. 2d 314 (2018); *Zdziebloski Vo Town of E. Greenbush*, 2017 WL 1968672, at *4

(N.D.N.Y. May 11, 2017) (*Rapanos* "considered whether the CWA covers "discharges of

pollutants into wetlands adjacent to nonnavigable tributaries of traditional navigable waters")

(citation and internal quotation marks deleted).[6]

---

[6]     In *Rapanos*, Justice Scalia's plurality and Justice Kennedy's concurrence offered
different tests for determining whether a wetland adjacent to a tributary of a traditional navigable
water is subject to regulation under the CWA.  547 U.S. at 810.  According to Justice Scalia's

Here, the wetlands adjacent to the Property have a continuous surface connection with a relatively permanent body of water (Heady Creek) that is connected to traditionally navigable waters, as well as a "significant nexus" with navigable waters due to their chemical, physical, and biological effect on those waters.  As such, they are protected by CWA § 404 under both Justice Scalia's and Justice Kennedy's tests in *Rapanos* 547 U.S. at 742.

Based on the totality of evidence presented at the preliminary injunction hearing, the Court finds that with respect to the instant litigation, the material fill was discharged onto wetlands that are "waters of the United States" as defined by § 502(7) of the Act, 33 U.S.C. § 1362(7).

### 5.    *The Lack of a Permit*

Section 404 of the CWA authorizes the Secretary of the Army, through the U.S. Army Corps of Engineers, to issue permits for "the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  Here, the EPA coordinated with the U.S. Corps of Engineers and learned that Defendant had not been issued any permits authorizing his activity on the Property.  Andreescu testified that there was no evidence in any EPA records that Defendant Smith had applied for or received a permit.  Tr. I at 16.  Defendant Smith has never refuted or denied that fact.  Based on the testimony as well as the documentary

---

approach, wetlands only fall within CWA jurisdiction when they are adjacent to a "relatively permanent body of water connected to traditional interstate navigable waters" and have "a continuous surface connection with that water." *Rapanos*, 547 U.S. at 742 (plurality opinion). Under Justice Kennedy's approach, wetlands only fall within CWA jurisdiction when there is a "significant nexus" between the wetlands in question and navigable waters in the traditional sense" such that the wetlands "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 779-80 (Kennedy, J., concurring in the judgment).

evidence presented at the hearing, the Court finds that Defendant Smith did not have a permit to discharge fill material into the wetlands adjacent to the Property.

In view of the record evidence and the foregoing analysis, the Court finds that the Government has met the first prong of its burden by adequately establishing that Defendant Smith violated the CWA.  Defendant Smith presented no documentary or testimonial evidence of his own to controvert the Government's evidence.  Defendant Smith's asserted defense is that the Shinnecocks are a sovereign nation and are self-governed.  Tr. II at 87.  As such, the Defendant maintains that the Government has no authority to interfere with the sovereign rights of the reservation or his land.  *Id.*  That argument is not sufficient to overcome the evidence presented by the Government.

It is important to note, however, that the Court's analysis does not end here.  In deciding whether to impose a preliminary injunction, the Court must also determine the likelihood that Defendant's violations will recur absent injunctive relief.

### B.    Likelihood of Recurrence Absent Injunctive Relief

"To enjoin future behavior, the government must show that . . . there is some reasonable likelihood that the violations may recur."  *Acquest Transit LLC*, 2009 WL 2157005 at *1 (citing *United States v. Blue Ribbon Smoked Fish, Inc.,* 179 F.Supp.2d 30, 50 (E.D.N.Y.2001)).  In determining the reasonable likelihood that violations may recur, a court can infer future violations from past unlawful conduct.  *See Blue Ribbon Smoked Fish, Inc.,* 179 F.Supp.2d at 50 (citing *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135, 144 (2d Cir.1977)).

In *Acquest Transit LLC*, the court found a reasonable likelihood that violations of the CWA would recur where the EPA had issued two "Cease and Desist" orders, each directing that

28

Acquest and its agents cease all earthmoving work in any portion of the subject property until the activities were authorized or determined not to be in violation of the CWA, both of which Acquest ignored. *Acquest Transit LLC*, 2009 WL 2157005 at \*10.

Here, Defendant has failed to comply with several directives related to his activities on the Property. Most importantly, Defendant Smith failed to comply with the EPA's May 3, 2017 ACO, which directed him not to cause any discharges of dredged or fill material, to remove all unauthorized fill material, and to restore the wetlands to their pre-violation condition. Tr. I at 44-45*;* Andreescu Decl. ¶ 23 and Ex. 12 (ACO). In addition, Defendant failed to respond to the EPA's March 1, 2017 RFI, and altogether failed to comply with the Shinnecock Nation Tribal Council's Cease and Desist Order which precipitated the EPA's involvement in the instant matter. Tr. I at 35, 42; Andreescu Decl. ¶¶ 16-17, 22.

Defendant's history of failing to comply with the CWA requirements shows a likelihood that, absent a preliminary injunction, Defendant will continue to engage in unlawful activities on the Property, including the unauthorized filling of waters of the United States. Significantly, Defendant recently erected a fence upon the Property, preventing Shinnecock Nation members and anyone else from observing his activities, including whether he continues the unauthorized dumping of fill material into the wetlands. Andreescu Decl. ¶ 27. And, even after the commencement of this litigation, Defendant has not attempted to obtain a permit from the U.S. Army Corps of Engineers for his activities. *Id.* ¶ 28. The Court finds that the Government has sustained its burden with respect to the second prong of the test, namely, that there is a reasonable likelihood that violations may recur.

For these reasons, the Court finds that the Government is entitled to a preliminary injunction — the Government has shown that Defendant Smith violated the CWA and that there

is a reasonable likelihood that such violations will recur. Therefore, the Court respectfully recommends to Judge Mauskopf that the Government's motion for a preliminary injunction be GRANTED and that a preliminary injunction be issued enjoining Defendant and those individuals acting in concert with him, from placing fill material into waters of the United States from his allotment of land, located at 5 East Creek Way on the eastern shore of the Shinnecock Indian Nation territory within the geographic boundaries of the Town of Southampton, New York.[7]

### C.    Expedited Discovery

The Government also seeks limited expedited discovery to compel Defendant to provide information requested through an RFI dated March 1, 2017 relating to the claims and relief sought in this action. *See* Pl.'s Mem. at 17. Specifically, the Government seeks an expedited response so that it can determine whether Defendant continued to make unauthorized discharges into the wetlands at issue, as well as the nature and composition of any discharged materials. *Id*.

Pursuant to FRCP 26(d)(l), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d)(l). "Courts in this district have applied a flexible standard of reasonableness and good cause in determining whether to grant a party's expedited discovery request." *N. A. Operating Co., Inc. v. Evergreen Distributors LLC*, 293 F.R.D. 363, 367 (E.D.N.Y. 2013) (citations and internal quotation marks deleted*); see also Pietsch v. Police Officer Vito Marcantonio*, 2016 WL 1069656, at *4 (E.D.N.Y. Mar. 16, 2016). The reasonableness and good cause test "requires only that the moving party 'prove that the

---

[7]     Although the Government is not required to prove irreparable harm, the Court notes that the Government has shown that Defendant's activities seriously endanger the important environmental and ecological functions of the wetlands at issue, which are well recognized. *See e.g.*, 40 C.F.R. 320.4(b)(1) (noting "most wetlands constitute a productive and valuable public resource, the unnecessary alteration or degradation of which should be discouraged as contrary to the public interest.")

requests are reasonable under the circumstances.'" *New York by Schneiderman v. Griepp*, 2017 WL 3129764, at *1 (E.D.N.Y. July 20, 2017) (quoting *Pietsch*, 2016 WL 1069656, at *4)).  A request meets the reasonableness standard where expedited discovery may lead to evidence of additional and continuing violations.  *See N. A. Operating Co., Inc.*, 293 F.R.D. at 367 (citing *Twentieth Century Fox Film Corp. v. Mow Trading Corp*, 749 F.Supp. 473, 475 (S.D.N.Y.1990) ("In counterfeiting cases, expedited discovery may need to be granted because discovery on 'an expedited basis may very well lead to evidence of continuing infringement by this defendant or others; it may also lead to the discovery of future plans to infringe or the discovery of additional infringing merchandise'")).

Here, expedited discovery compelling Defendant to provide updated information in response to the RFI is reasonable and appropriate in conjunction with the Government's application for a preliminary injunction so that the Government can determine whether Defendant continued and/or plans to continue to make unauthorized discharges into the wetlands at issue.  *See New York by Schneiderman v. Griepp*, 2017 WL 3129764, at *1 (E.D.N.Y. July 20, 2017) (citations omitted); *Samuel, Son & Co., Inc. v. Beach*, 2013 WL 4855325, at *4 (W.D. Pa. Sept. 11, 2013) ("As an initial matter, courts have frequently observed that expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings") (internal quotation marks deleted) (citations omitted).  The Court also finds that expedited discovery would not pose a substantial hardship to Defendant Smith. The information sought should be within the possession and control of Mr. Smith and limited expedited discovery on these issues does not appear to be overly broad or burdensome.  *See Twentieth Century Fox Film Corp.*, 749 F. Supp. at 475.  Further, "the irreparable injury that defendant potentially faces in the absence of expedited discovery is of far greater significance

than any inconvenience to defendant from such expedited discovery." *Id*.

For these reasons, the Court respectfully recommends to Judge Mauskopf that an order be issued granting limited expedited discovery — namely, responses to the Government's RFI, originally sent to Defendant Smith on March 1, 2017.

## VII.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Mauskopf that the Government's motion for a preliminary injunction be GRANTED and that a preliminary injunction be issued enjoining Defendant and those individuals acting in concert with him, from placing fill material into waters of the United States from his allotment of land, located at 5 East Creek Way on the eastern shore of the Shinnecock Indian Nation territory within the geographic boundaries of the Town of Southampton, New York.  The Court further recommends that Plaintiff's motion for limited expedited discovery be GRANTED and that Defendant be ordered to respond to an updated RFI, originally sent to him on March 1, 2017.

## VIII.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) and (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  In the case of a party proceeding *pro se*, the party must file his objections in writing with the Clerk of the Court within the 14-day period noted above.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Roslynn Mauskopf.  Any requests for an extension of time for filing objections must be directed to Judge Mauskopf prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those

objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Beverly v. Walker,* 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

**Counsel for the Government is directed to serve a copy of this Report and Recommendation forthwith on the *pro se* Defendant by overnight mail and first-class mail – and by email if feasible – and to file proof of such service on ECF promptly.**

**SO ORDERED.**

Dated:  Central Islip, New York
            September 30, 2019

/s/ A. Kathleen Tomlinson
A.  KATHLEEN TOMLINSON
U.S. Magistrate Judge